UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOSTON BIT LABS, INC., d/b/a BIT BAR
SALEM, a Massachusetts corporation,

    Plaintiff,

  v.

MASSACHUSETTS GROWTH CAPITAL
CORPORATION, a Massachusetts body
politic and corporation,

    Defendant.

Civil Action No. _____

MEMORANDUM OF REASONS
IN SUPPORT OF MOTION FOR A
TEMPORARY RESTRAINING ORDER

**1.0    INTRODUCTION**

The First Amendment provides: "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." Despite Massachusetts' status as the Cradle of Liberty, the modern Commonwealth has a deficiency of respect for these rights.

Bit Bar was forced to file a lawsuit against the Commonwealth in order to vindicate its First Amendment and Due Process rights. That litigation remains pending.

Bit Bar wishes now to apply for a COVID-19 grant administered by MGCC. It cannot, however, because MGCC will not entertain applicants who are litigating against the Commonwealth. This is a deprivation of Plaintiff's freedom to petition.

**2.0    FACTUAL BACKGROUND**

Bit Bar owns and operates a restaurant-arcade which is an establishment that provides food and drink to patrons while allowing them to play video games. (*See* Verified Complaint at ¶ 4.)

On or about March 10, 2020, Gov. Baker declared a state of emergency in the Commonwealth of Massachusetts due to the outbreak of the 2019 novel Coronavirus ("COVID" or "COVID-19"). (*See* Massachusetts Executive Order No. 591 and Verified Complaint at ¶ 5.)[1] The state of emergency continues to exist and, pursuant to Executive Order No. 591, involving the authority of Sections 5, 6,

---

[1] Available at: https://www.mass.gov/executive-orders/no-591-declaration-of-a-state-of-emergency-to-respond-to-covid-19 (last accessed Aug. 18, 2020).

7, 8 & 8A of Chapter 639 of the Acts of 1950, Gov. Baker has issued and continues to issue a series of further orders under the nomenclature of "COVID-19 Order." (*See* Verified Complaint at ¶ 6.)

On March 3, 2020, Gov. Baker issued COVID-19 Order No. 13 shutting down most brick-and-mortar businesses in Massachusetts as "non-essential," allowing Bit Bar's business only to provide food takeout services. (*See* COVID-19 Order No. 13).[2] Pursuant to COVID-19 Order No. 19, the Department of Public Health is charged with enforcing the shut-down of Bit Bar's business pursuant to Mass.Gen.Laws, ch. 111, § 30. (*See* COVID-19 Order No. 19).[3] The shut-down was extended on March 31, April 28, and May 15, 2020 by COVID-19 Orders No. 21, 30, and 32, respectively. (*See* COVID-19 Order No. 21;[4] COVID-19 Order No. 30;[5] COVID-19 Order No. 32).[6]

On May 18, 2020, Gov. Baker instituted a planned phased reopening process. (*See* COVID-19 Order No. 33).[7] COVID-19 Order No. 33 permitted certain types of businesses to reopen on May 18 & 25, 2020, with all other previously-closed businesses remaining closed. On June 1, 2020, Gov. Baker issued COVID-19 Order No. 35 identifying certain businesses as "Phase II" businesses and permitting them to begin preparing to reopen, including restaurants and retail stores. (*See* COVID-19 Order No. 35).[8] COVID-19 Order No. 35 also identified business sectors that would be reopened as part of the eventual Phases III & IV. Bit Bar's business, like casinos, museums, fitness centers, and performance halls, was categorized as part of the Phase III enterprises. *See id.*

---

[2]   Available at: https://www.mass.gov/doc/march-23-2020-essential-services-and-revised-gatherings-order/download (last accessed Aug. 26, 2020).
[3]   Available at: https://www.mass.gov/doc/virtual-shareholder-meeting-order/download (last accessed Aug. 26, 2020).
[4]   Available at: https://www.mass.gov/doc/march-31-2020-essential-services-extension-order/download (last accessed Aug. 26, 2020).
[5]   Available at: https://www.mass.gov/doc/signed-second-extension-of-essential-services-order/download (Aug. 26, 2020).
[6]   Available at: https://www.mass.gov/doc/may-15-2020-24-hour-extension-order/download (last accessed Aug. 26, 2020).
[7]   Available at: https://www.mass.gov/doc/may-18-2020-re-opening-massachusetts-order/download (last accessed Aug. 26, 2020).
[8]   Available at: https://www.mass.gov/doc/order-preparing-for-phase-ii-reopening/download (last accessed Aug. 26, 2020).

Gov. Baker reiterated that arcades would be part of Phase III in an order of June 6, 2020. (*See* COVID-19 Order No. 37).[9] By order of July 2, 2020, Phase III businesses were permitted to reopen beginning July 6, 2020. (*See* COVID-19 Order No. 43).[10] Without warning, explanation, or due process, in COVID-19 Order No. 43 Gov. Baker recategorized arcades as a Phase IV enterprise along with ball-pits, hot tubs, steam rooms, and dance clubs for 2020, while recategorizing theaters, concert halls, ballrooms, laser tag arenas, and private-party rooms as Phase III. *See id.* and Verified Complaint at ¶ 7.

According to Dr. Cassandra Pierre, an infectious disease specialist, the movement of arcades to Phase IV is "arbitrary." (Michael Rosenfield, "'I Don't See It Ending Well': Arcades Struggling to Survive Amid Pandemic Closures," NBC BOSTON (Aug. 4, 2020)).[11] Video games constitute protected speech. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 790 (2011). Thus, after learning of the arbitrary distinction Gov. Baker drew between gambling arcades and video game arcades, on September 2, 2020, Plaintiff filed suit in this Court, styled *Boston Bit Labs, Inc. v. Baker*, Case No. 1:20-cv-11651-RGS (D. Mass.) (hereinafter "Baker suit"), raising claims under 42 U.S.C. § 1983 for violation of the First and Fourteenth Amendments. (*See* Verified Complaint at ¶ 9). BitBar sued to vindicate its due process right and its First Amendment rights. In doing so, it not only vindicated its own rights, but the rights of other video game arcades that did not participate in the litigation, but who enjoyed the benefits that it conferred. *(See id.* at ¶ 10).

Pursuant to House Bill No. 4808, the 191st General Court, at item 1599-1232, allocated reserve funds to

> "be transferred to the Massachusetts Growth Capital Corporation established in chapter 40W of the General Laws for grants to support small businesses negatively impacted by the 2019 novel coronavirus; provided further, that eligible grant applicants shall have no more than 50 employees; provided further, that grants may be used for

---

[9] Available at: https://www.mass.gov/doc/june-6-2020-phase-ii-reopening/download (last accessed Aug. 26, 2020).
[10] Available at: https://www.mass.gov/doc/phase-3-order-july-2-2020/download (last accessed Aug. 26, 2020).
[11] Available at: https://www.nbcboston.com/news/coronavirus/i-dont-see-it-ending-well-arcades-struggling-to-survive-amid-pandemic-closures/2171296/ (last accessed Aug. 27, 2020).

employee payroll and benefit costs, mortgage interest, rent, utilities and interest on other debt obligations; provided further, that priority in awarding grants shall be given to: (i) businesses that focus on reaching underserved markets; (ii) minority-owned, women-owned and veteran-owned businesses; and (iii) businesses that have not received aid from federal programs related to the 2019 novel coronavirus[.]"

(*See also, id.* at ¶ 13). Eligible businesses may apply for a COVID-19 grant through the MGCC at its website at a link provided on https://www.empoweringsmallbusiness.org/covid-19-response/covid-19-grants-massachusetts-small-businesses  (hereinafter "MGCC Grant Page"). (*See id.* at ¶ 14). Among the requirements on the MGCC Grant Page for applicants is:

"Business must be in good standing with the state and city/town:

- Business must be current on all taxes due through 3/1/2020; and

- Have active and valid state licenses/registrations, if applicable; and

- *Not a party to litigation involving the Commonwealth or municipality you operate in.*"

(*See id.* at ¶ 15). Having sued to vindicate its First Amendment rights, Plaintiff is not eligible to apply to MGCC for the funding. (*See id.* at ¶ 16). There is a narrow window to apply for a grant—the window opened on October 22, 2020 and closes on November 12, 2020. (*See* MGCC Grant Page). Plaintiff attempted to apply, but had to check a box on the MGCC website that said that it was a party to litigation involving the Commonwealth. (*See Verified Complaint* at ¶ 17). Every other similarly situated video game arcade or any other business in Massachusetts can apply for the COVID-19 grant through MGCC except for Plaintiff. (*See id.* at ¶ 18).

**3.0     LEGAL STANDARD**

"The standard for issuing a temporary restraining order is 'the same as for a preliminary injunction.'" *ACA Int'l v. Healey*, No. 20-10767-RGS, 2020 U.S. Dist. LEXIS 79716, at *7 (D. Mass. May 6, 2020) *quoting Bourgoin v. Sebelius*, 928 F. Supp. 2d 258, 267 (D. Me. 2013). A district court must consider four factors in deciding whether to grant a preliminary injunction: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant is enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Charlesbank equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

"The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  The plaintiff has the burden of establishing these four factors weigh in their favor.  *Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

## 4.0   ARGUMENT

### 4.1   Likelihood of Success on the Merits

Likelihood of success on the merits "is the most important of the four preliminary injunction factors." *Doe v. Trs. Of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019).  Particularly in First Amendment cases, "the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Sindicato Puertorrigueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10-11 (1st Cir. 2012).

#### 4.1.1   Violation of the First Amendment

The right to petition is older than the republic.  The English Bill of Rights of 1689, explicitly protected the "Right of the Subjects to petition the King." 1 Wm. & Mary, Sess. 2, ch. 2. In 1776, the Declaration of Independence cited King George's failure to respect the right to petition as one of the justifications for independence:

> In every stage of these Oppressions We have Petitioned for Redress in the most humble terms: Our repeated Petitions have been answered only by repeated injury. A Prince, whose character is thus marked by every act which may define a Tyrant, is unfit to be the ruler of a free people.

The Declaration of Independence ¶ 30.

The First Amendment's petition clause is often forgotten.  The Freedom Forum conducted a survey, where only 4% of respondents could recall the Petition clause as one of the Five Freedoms. Freedom Forum Institute, *The 2019 State of the First Amendment 2019* at 4 (2019).[12]  The 96% who could not recall this fundamental freedom are in good company.  Justice William J. Brennan, known as a lion of the First Amendment, did not even mention the right when he wrote "The American Bill of Rights, guaranteeing freedom of speech, religion, assembly, and the press, ...provides a noble

---

[12]   Available at https://www.freedomforuminstitute.org/wp-content/uploads/2019/06/SOFAreport2019.pdf (last accessed Oct. 27, 2020).

expression and shield of human dignity." William J. Brennan, Jr., *Why Have a Bill of Rights?*, 26 VAL.U.L.REV. 1, 1 (1991). More recently, our newest Supreme Court Justice, Amy Coney Barrett, briefly forgot the Petition Clause when being questioned by Senator Ben Sasse during her confirmation hearings. Sasse, trying to help her out, got it wrong as well.

Clearly whoever drafted the regulations for the MGCC also forgot about the Petition Clause. Just because they share that with Supreme Court Justices, Senators, and 96% of their fellow citizens does not excuse their transgressions. To provide government aid, with the condition that any citizen wishing to enjoy that aid must give up one of their First Amendment rights is an unconstitutional condition. "The government's power to impose conditions on the receipt of government benefits … is not without limitation." *Kennedy v. Gardner*, No. C-96-574-B, 1998 U.S. Dist. LEXIS 23575, at *5-6 (D.N.H. June 5, 1998). Importantly, "a condition on the receipt of a government benefit will be deemed unconstitutional unless some reasonable relationship exists between the condition and the benefit being conferred." *Id.* citing *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987).

Plaintiff is likely to succeed on its First Amendment claim brought through Section 1983. "A claim under § 1983 has two 'essential elements': the defendant must have acted under color of state law, and his or her conduct must have deprived the plaintiff of rights secured by the Constitution or by federal law." *Gagliardi v. Sullivan*, 513 F.3d 301, 306 (1st Cir. 2008). These elements are met.

MGCC acted under color of state law. MGCC is a "body politic and corporate" established by the Commonwealth. Mass. Gen. Laws, ch. 40W, § 2(a). As a "body politic and corporate", it "is not considered a state agency or otherwise an 'arm or 'alter ego' of the state" rendering it, therefore susceptible to liability under 42 U.S.C. § 1983. *Collins v. Univ. of N.H.*, No. 09-cv-78-LM, 2010 U.S. Dist. LEXIS 95573, at *4 (D.N.H. Aug. 25, 2010). At all relevant times, it is charged with administering to COVID-19 Grant and, in doing so, it is acting under color of state law.

Bit Bar has been deprived of its freedom to petition; it is forced between choosing to maintain the suit against Gov. Baker to seek redress for the suppression of its First Amendment and Due Process rights, or it can surrender those rights in exchange for the privilege of applying for a grant. The First Amendment guarantees every citizen's right "to petition the Government for a redress of grievances."

U.S. CONST. amend. I. "The right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741, 103 S. Ct. 2161, 2169, 76 L. Ed. 2d 277 (1983). MGCC's exclusion of applications who litigate against the Commonwealth and its municipalities has and will proximately harm Bit Bar, simply because it was courageous enough to challenge the wrongs of Gov. Baker.

In any First Amendment claim based on a direct regulation of the freedom to petition, strict scrutiny applies. *See Wirzburger v. Galvin*, 412 F.3d 271, 277 (1st Cir. 2005); *compare Maher v. Roe,* 432 U.S. 464, 475 n.8, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977) (although government may deny funding for the exercise of a constitutional right, in that case, abortion, a regulation denying general welfare benefits to those who had had exercised that right and would otherwise be entitled to benefits would be subject to strict scrutiny). To survive strict scrutiny analysis, a restriction on First Amendment rights must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011).

The MGCC's restriction on those who litigate against the Commonwealth does not survive strict scrutiny. There is no compelling interest in restricting COVID-19 grants to those who are not in litigation with the Commonwealth or a municipality. Though there may be a concern that grant funds should be used toward payroll and ordinary business functions, rather than for litigation purposes, it should not matter that the other party to litigation is the Commonwealth or a municipality. Such litigation is often essential, such as in zoning cases, freedom of information claims, or, as in Bit Bar's, to vindicate constitutional rights. Or, it may be defending itself against invalid claims brought against it by the state or a municipality. There is no compelling government interest in forcing a grantee to abandon a meritorious litigation position.

Neither is the restriction narrowly tailored. The burden on the First Amendment "is unacceptable if less restrictive alternatives would be at least as effective achieving [their] legitimate purpose." *Reno v. ACLU*, 521 U.S. 844, 849 (1997). Instead of precluding any applicant who happens to find itself in litigation with the Commonwealth or a municipality, the MGCC could simply require

grant recipients to not use the funds for litigation purposes. This is far from the narrow tailoring necessary to justify a restriction on petitioning. Bit Bar thus has a strong likelihood of success on the merits of its First Amendment claim.

### 4.1.2   Violation of the Fourteenth Amendment

The MGCC regulation violates equal protection. Liability under § 1983 based on equal protection principles mandates that plaintiff present sufficient evidence for a trier of fact to conclude that""(1) [plaintiff] compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Rubinovitz v. Rogato*, 60 F.3d 906, 910 (1st Cir. 1995) (citations and internal quotation marks omitted). The test applied depends on the type of classification and the conduct being regulated. If a regulation burdens "fundamental rights" such as free speech or employs "suspect" classifications such as race, the regulation is subject to strict scrutiny. *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003). If fundamental rights or suspect classifications are not implicated, then the regulation need only satisfy rational basis review. *Hodel v. Ind.*, 452 U.S. 314, 331-32 (1981).

The First Amendment and Equal Protection analyses are similar here. As explained in above, the MGCC restriction burdens Bit Bar's fundamental First Amendment right to petition. And, it gives preferential treatment to those who chose not to vindicate their freedoms, despite there being no conceivable reason for doing so. MGCC thus burdened Bit Bar's First Amendment rights without furthering a compelling government interest in a narrowly tailored fashion, thus violating Bit Bar's right to equal protection under the Fourteenth Amendment.

MGCC's restriction is arbitrary and cannot survive even rational basis review. Rational basis review is satisfied if the means are rationally related to a legitimate government purpose." *Hodel v. Indiana*, 452 U.S. 314, 331 (1981). There is no conceivable connection between a preference for those who are not litigating against the Commonwealth and a legitimate government interest. In fact, whatever interest it is, it would be illegitimate. The Supreme Court has held that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—

especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).  The Court wrote that "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Id*.  Moreover, the legislature cannot "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan v. Taxation with Representation of Wash*., 461 U.S. 540, 548 (1983) (quoting *Speiser v. Randall*, 357 U.S. 513, 519 (1958)).  There is no legitimate purpose in penalizing a litigant who brings a meritorious claim against the Commonwealth for violation of Federal Constitutional rights.  To hold otherwise would turn Constitutional jurisprudence on its head and allow states to nullify federal law.  Accordingly, Bit Bar has a strong likelihood of prevailing on the merits of its Fourteenth Amendment claim.

**4.2    Irreparable Harm**

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374 (1976).  Because of this, if a plaintiff demonstrates a likelihood of success, they necessarily also establish irreparable harm.  *Fortuño*, 699 F.3d at 15.

Because there is a strong likelihood of success on the merits of Bit Bar's claims under the First and Fourteenth Amendments, Bit Bar has also shown a probability of irreparable harm in the absence of an injunction.  But beyond this presumption of irreparable harm, Bit Bar is being demonstrably harmed by the restriction.  A significant portion of its business was unable to operate for months, leading to a decrease in revenue that likely could lead to Bit Bar going out of business entirely.  (*See* Verified Complaint at ¶ 19).  The funding is necessary to maintain operations, especially as COVID-19 could spike again.  (*See id.*) Alternately, Bit Bar would be fundamentally harmed if it abandon the litigation to take advantage of the grant.  However, the grant window is so narrow that Bit Bar can not wait for the normal course of litigation to vindicate its rights.  By the time that happens, the program will be closed.  Bit Bar needs urgent relief.

This situation is reminiscent of *414 Theater Corp. v. Murphy*, 499 F.2d 1155 (2d Cir. 1974), in which a coin-operated film machine operator sought injunctive relief from an arbitrary licensure ordinance. In affirming the injunction, the Second Circuit found,

> Upon the facts of this case, if the ordinance were enforced against appellee, appellee would be required to choose between continuing without a license in the business of offering its films, thereby subjecting itself and its employees to the threat of criminal and civil prosecution, and removing the film machines from its premises permanently, obviating the need for a license, or temporarily, pending the determination of a license application. The latter possibility -- removing the film machines -- involves a deprivation of appellee's and the public's first amendment rights to show and to view films, and in itself constitutes irreparable injury justifying injunctive relief, because there is no means to make up for the irretrievable loss of that which would have been expressed. Moreover, the other option -- violating the law to exercise one's constitutional rights and awaiting the sure hand of the law -- itself may cause, as it is alleged to cause, irreparable injury both economic (in the form of loss of revenue because customers are fewer and increase in costs due to the difficulty of finding employees willing to risk arrest, prosecution and possible imprisonment) and personal (the freedom to exercise first amendment rights without genuine fear of prosecution). Where other plaintiffs have faced the similar situation of being required to forego constitutionally protected activity in order to avoid arrest, the Supreme Court has found irreparable injury. So also do we find the position of appellee, between the Scylla of intentionally flouting the ordinance and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding, to cause irreparable injury where the result is the stifling of first amendment expression.

499 F.2d at 1160 (internal citations and quotation marks omitted. The Second Circuit decision was favorably cited in this District in the issuance of an injunction against a fortune telling business, where the Court stated "I am satisfied that if this injunction does not issue, the plaintiff will suffer damages in the form of a lost business opportunity that cannot be fully compensated by some future monetary award and further that she will suffer irreparable injury to the exercise of her constitutional rights. I therefore am satisfied that she has established a substantial risk of irrevocable harm." *Talamov v. Provincetown Bd. of Selectmen*, 1983 U.S. Dist. LEXIS 17058, at *6 (D. Mass. May 10, 1983). So, too, will Bit Bar suffer irreparable harm if it cannot maintain its litigation, operate its video games, and offer their content to the public.

### 4.3 Balance of Hardships

When a government regulation restricts First Amendment-protected activity, the balance of hardships tends to weigh heavily in a plaintiff's favor. *See Firecross Ministries v. Municipality of Ponce*, 204 F. supp. 2d 244, 251 (D.P.R. 2002).

The balance here weighs decisively in Bit Bar's favor. The infringement on Bit Bar's First Amendment rights alone would normally be enough to resolve this factor in favor of Bit Bar. But beyond this constitutional hardship, Bit Bar is in real danger of going out of business due to Gov. Baker's prior arbitrary COVID-19 Orders. MGCC's countervailing interests would not be compromised in any way by entering the requested injunction. In fact, MGCC should be praising, not penalizing, Bit Bar for reopening an entire sector of business.

### 4.4 Public Interest

"The public interest is served by protecting First Amendment rights from likely unconstitutional infringement." *Comcast of Maine/New Hampshire, Inc. v. Mills*, 435 F. Supp. 3d 228, 250 (D. Me. 2019). The public interest is served by issuing an injunction where "failure to issue the injunction would harm the public's interest in protecting First Amendment rights in order to allow the free flow of ideas." *Magriz v. union do Tronquistas de Puerto Rico, Local 901*, 765 F. Supp. 2d 143, 157 (D.P.R. 2011) (citing *United Food & Commer. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 363 (6th Cir. 1998)). "When a constitutional violation is likely, moreover, the public interest militates in favor of injunctive relief because 'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Id*. (quoting *Miller v. City of Cincinnati*, 622 F.3d 524, 540 (6th Cir. 2010)).

There is no public interest in punishing a litigant for vindicating fundamental First Amendment freedoms. The requested injunction would be in the public interest.

/ / /


/ / /

**5.0    CONCLUSION**

For the foregoing reasons, the Court should enter a preliminary injunction against MGCC, precluding it from discriminating against applicants involved in litigation with the Commonwealth or municipalities.

Dated: October 27, 2020                Respectfully Submitted,

/s/ Marc J. Randazza
Marc J. Randazza, BBO# 651477
mjr@randazza.com, ecf@randazza.com
Jay M. Wolman, BBO# 666053
jmw@randazza.com, ecf@randazza.com
RANDAZZA LEGAL GROUP, PLLC
30 Western Avenue
Gloucester, MA 01930
Tel: (978) 801-1776

*Attorneys for Plaintiff*
*Boston Bit Labs, Inc*